**UNITED STATES of America, Plaintiff,**

v.

**Gus ALEX, et al., Defendants.**

**No. 91 CR 727-2.**

United States District Court, N.D. Illinois, E.D.

April 3, 1992.

Chris C. Gair, U.S. Attorney's Office, Chicago, Ill., for plaintiff.

Martin S. Agran, Agran & Agran, Chicago, Ill., for M. Rainone.

Carl M. Walsh, Chicago, Ill., for G. Alex.

David S. Mejia, Oak Park, Ill., for L. Patrick.

Kenneth Hamilton Hanson, Chicago, Ill., for N. Gio.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is the government's motion to disqualify Edward M. Genson and the law firm of Genson, Steinback & Gillespie ("GSG"), as counsel for defendant Gus Alex ("Alex").[1] After careful consideration of the sealed pleadings, including the government's memorandum in support of its motion to disqualify counsel, Alex's response,[2] the government's reply and Alex's surreply, we grant the government's motion.

### I. FACTS

On December 18, 1991, a grand jury returned a superseding indictment charging that Alex and other co-defendants conspired to operate the Lenny Patrick Street Crew through a pattern of racketeering activity. Specifically, Alex is named in Count One of the indictment which alleges a violation of 18 U.S.C. § 1962(d) through eleven separate acts of extortion and intimidation against eleven different individuals.[3] Four of the individuals who were allegedly approached by Alex's co-conspirators ultimately retained the legal services of GSG in connection with the grand jury investigation leading up to the indictment in this case. These four individuals are Phillip M. Freedman and Myron Freedman, owners of Myron and Phil's Steak, Seafood and Piano Bar, William Moss ("Moss"), owner of Billy and Company Restaurant, and Raymond Hara ("Hara"), owner of King Nissan.[4]

According to the government, each of these individuals were interviewed by the FBI during the grand jury investigation. The government further represents that initially each individual either refused to cooperate or made false statements to the FBI. GSG and Genson do not challenge this statement. Ultimately, each individual retained and was represented by GSG.

In June, 1991, an attorney contacted Terrence Gillespie ("Gillespie"), a partner at GSG, to represent Phillip Freedman in connection with a grand jury investigation. As it turns out, both Gillespie and Geena Cohen ("Cohen"), then an associate with GSG, were retained by and represented the Freedmans and Moss. Furthermore, acting upon a referral from another attorney, Hara contacted Genson in or around June, 1991. Genson represents that he spoke briefly with Hara. Thereafter, Genson telephoned Assistant United States Attorney Chris Gair and informed him that GSG would be representing Hara. Genson further represents that he then referred Hara to his partner, Jeffrey Steinback ("Steinback"). According to Genson, he "did not

---

1. So that the record is clear the law firm is now known as Genson, Steinback, Gillespie & Martin.

2. In his response filed on March 20, 1992, Alex also requested leave of court to allow Genson to appear as his co-counsel. The belated filing of Alex's motion is curious because Genson filed his appearance on behalf of Alex without first obtaining leave of court on March 2, 1992. We deny Genson's request to file his appearance on behalf of Alex for the same reasons that we disqualify Genson and GSG.

3. In addition, the indictment charges that all property and proceeds constituting and derived from direct and indirect racketeering activity in violation of 18 U.S.C. § 1962 are subject to forfeiture by the United States.

4. In Count One of the indictment Myron and Phil's is identified as Restaurant 2, Billy and Company Restaurant is identified as Restaurant 3 and King Nissan is identified as Car Dealership 1.

involve himself in any aspect of Hara's representation." (Alex's Response, p. 3).

In connection with its investigation, the government met on several occasions with the business owners and their lawyers from GSG. Several of these interviews took place at GSG's law offices. In fact, at each interview with these individuals, lawyers from GSG were present. The Freedmans and Moss were represented by either Gillespie or Steinback. In addition, Cohen was also in attendance at some of the meetings involving these individuals. Finally, Genson appeared briefly during at least one meeting.

The government's representation that Steinback, Gillespie and Cohen each revealed to the government that they had detailed discussions with the Freedmans, Moss and Hara is not challenged by Alex. Nor does Alex challenge the government's statement that GSG lawyers expressed to the government and the FBI their personal opinions about the truthfulness of the witnesses. Apparently, these individuals were terrified of testifying against Lenny Patrick or others out of fear of retribution from members of organized crime. In point of fact, in order to persuade GSG's clients to truthfully testify before the grand jury Steinback demanded formal immunity on behalf of GSG's clients. Three of these individuals were witnesses before the grand jury.

At all relevant times, from the grand jury investigation to the present, Alex has been represented by Carl Walsh ("Walsh"). After the superseding indictment was returned on December 18, 1991, Walsh surrendered Alex to federal authorities. The government represents that at that time Walsh advised the United States Attorney's Office that he was going to bring in Genson to assist in Alex's representation. At that juncture, the government discussed the nature of the conflict in detail with Steinback. On December 23, 1991, Walsh filed his appearance on behalf of Alex. Approximately two and one-half months later, on March 2, 1992, Genson filed his appearance on Alex's behalf.[5]

Notwithstanding Genson's failure to file a timely appearance and to apprise this court of his representation of Alex, this court discovered for the first time on March 20, 1992, six weeks before this case is scheduled for trial, that Alex retained Genson on August 9, 1991. To further exacerbate matters, this court is now informed, almost three and one-half months after the superseding indictment came down, that Genson has been meeting with Alex and Walsh on the average of at least twice a week since August, 1991. We have also been informed that Genson participated in the preparation of Alex's pretrial motions. Surprising to this court, the pretrial motions filed on Alex's behalf do not bear any indication of Genson's involvement.

As of June, 1991, two months before Alex retained Genson, lawyers at Genson's firm were representing individuals allegedly threatened and/or intimidated by Alex's co-defendants. These former clients of GSG are now represented by other attorneys. The record does not disclose who represents Hara and Moss. The Freedmans are represented by Cohen, a former associate at GSG.[6]

Alex has attached the affidavits of Phillip M. Freedman, Myron Freedman, Moss and Hara dated respectively, August 14, 1991, September 19, 1991, August 14; 1991 and September 17, 1991. These affidavits bear a grand jury caption. In their affidavits each individual states that he agrees to Genson's representation of Alex. The government has issued trial subpoenas to each of GSG's former clients. The government anticipates that they will be central witnesses at trial to establish the racketeering conspiracy.

---

5. As discussed more fully in this memorandum opinion, Genson's belated filing of his appearance, without first obtaining leave of court, directly contravenes Rule 3.15 of the General Rules of the United States District Court for the Northern District of Illinois.

6. Cohen left GSG in October of 1991, and is presently employed as an associate of Beigel & Sandler.

## II. DISCUSSION

■ The government argues that Genson and GSG must be disqualified from representing Alex because an impermissible conflict of interest exists. According to the government, this conflict results from GSG's simultaneous representation during the grand jury investigation of several of the alleged victims of the extortionate acts allegedly committed by Alex and his co-defendants and one of the targets of the investigation. In this same vein, the government asserts that the interests of GSG's former clients, who were allegedly victimized by the activities of Alex and his co-defendants, are directly adverse to the interests of Alex, who is one of the defendants alleged to have victimized them. We are persuaded by the arguments advanced by the government. We agree that under the Rules of Professional Conduct for the Northern District of Illinois ("the Rules") and relevant case law, Genson and GSG must be disqualified from representing Alex.

### A. *Ethical Standards Under the Rules of Professional Conduct*

Rule 1.9(a) which addresses conflicts of interest involving former clients provides that:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which the person's interests are materially adverse to the interests of the former client unless the former client consents after disclosure.

Rule 1.9(a) of the Rules of Professional Conduct for the Northern District of Illinois. Similarly, Rule 1.10(a) disqualifies a law firm from representing a client "when the lawyer knows or reasonably should know that another lawyer associated with that firm would be prohibited from doing so by Rules 1.7, 1.8(c) or 1.9 . . . ." Rule 1.10(a) of the Rules of Professional Conduct for the Northern District of Illinois.[7]

The prohibitions of Rules 1.9 and 1.10 apply with great force to the instant case. Clearly, Genson seeks to represent Alex on the very same subject matter which prompted the Freedmans, Moss and Hara to retain GSG in the first place—the alleged acts of intimidation and extortion committed against them by the Lenny Patrick Street Crew. Alex does not argue that the matters are unrelated.

Equally compelling, the interests of GSG's former clients and Alex are materially adverse. We do not agree with Alex that the witnesses' interests and his own are not directly adverse. In support of his position, Alex asserts that the witnesses cannot reveal incriminating information about him. Furthermore, "Genson cannot use the confidences learned from GSG's representation of the former clients to their disadvantage since Genson does not know of any confidences." (Alex's Response, p. 14.) This is simply not the case.

We must refer to the principles set forth in Rule 1.7 to determine whether the interests of the present client and the former clients are adverse. *See* Comment to Rule 1.9 of the Rules of Professional Conduct for the Northern District of Illinois. We conclude that the positions of the former clients and Alex are incompatible. Presumably, the former clients and alleged victims have an interest in seeing that Lenny Patrick and his co-defendants are convicted. Conversely, Alex has a great interest in being acquitted of all charges. These interests are diametrically opposed and may not be reconciled.

In addition, whether or not Genson does or does not know of any confidences is of little import for the fundamental reason that his partners and associate were privy to such confidential communications.[8] It is uncontroverted that Steinback, Gillespie and Cohen engaged in confidential communications with the Freedmans, Moss and

---

7. There are certain exceptions to the imputed disqualification rule which are not relevant here.

8. In any event, we take Genson's representation that he does not know of any confidences with a "grain of salt" as it is undisputed that Genson appeared briefly during at least one meeting with Phillip Freedman and Moss.

Hara. As such, the disqualification of any of the lawyers in the GSG law firm would be imputed to Genson. Rule 1.10 of the Rules of Professional Conduct for the Northern District of Illinois.

Equally telling, we are not satisfied that Genson was "screened" from any privileged communications. In our view, it is highly implausible that a "Chinese Wall" was erected. In addition to Genson, Messrs. Steinback and Gillespie represent three of the four partners of GSG. By virtue of its small size, it is unlikely that Genson was not aware of what was going on at GSG. Therefore, we are satisfied that there is a possibility that Genson may be aware of privileged matters which may potentially be used to impeach the former client-witnesses on cross-examination. In our view, this is more than sufficient to meet the materially adverse interest requirement.

■ Finally, we view with caution the former clients' consents to Genson's representation of Alex. As a fundamental matter, the former clients' waivers are by no means binding on this court. In order to effectuate the goals behind the Rules, we have an obligation to independently review the former clients' consents to waive their former counsels' conflict of interest. The comments to Rule 1.7 which deal with the general rule regarding conflict of interest are instructive. Rule 1.7 recognizes that a client may consent to representation notwithstanding a conflict. However, the comments to Rule 1.7 emphasize that a court should not accept such consent in certain circumstances. Specifically, the comments state in pertinent part, that:

> However, as indicated in paragraph (a)(1) with respect to representation directly adverse to a client, and paragraph (b)(1) with respect to material limitations on representation of a client, when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.

This reasoning applies with great force to this case. We are satisfied that a disinterested lawyer would not agree to Genson's representation of Alex under these particular circumstances. In our opinion, these consents executed prior to the superseding indictment and before the Freedmans, Hara and Moss were subpoenaed by the government as witnesses at trial, do not comply with Rules 1.7 and 1.9. Genson labors under an impermissible conflict of interest and should be disqualified under Rule 1.9. It logically follows therefrom, that this disqualification is imputed to GSG under Rule 1.10.

Lastly, we recognize that Genson's and GSG's violation of this district's rules of professional conduct does not automatically require disqualification. *See United States v. Goot,* 894 F.2d 231, 234 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 45, 112 L.Ed.2d 22 (1990). However, it illustrates that there is an actual conflict of interest, or serious potential for a conflict of interest, which this court must carefully consider in weighing the parties' competing interests. In our opinion, violation of the ethical rules of this district certainly tips the balance in the government's favor.

### B. *Factors to Consider Regarding Disqualification*

Therefore, as required by established Seventh Circuit precedent we now undertake an independent evaluation weighing Alex's right to have *co-counsel* of his choice versus the interests of the witnesses, the government and the public. *United States v. O'Malley,* 786 F.2d 786, 790 (7th Cir.1986); *United States v. DeFazio,* 899 F.2d 626, 629 (7th Cir.1990). Disqualification is appropriate.

### 1. *Alex's Interest in Retaining Genson*

■ The law is straightforward and beyond dispute. The Sixth Amendment includes a "presumption in favor of counsel of choice," but that right is not absolute. *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). Essentially, Alex argues that denial of his counsel of choice will result in prejudice. However, the court is satisfied

that if Genson were allowed to proceed as co-counsel for Alex, even greater prejudice would result to the former client-witnesses, the public and the government.

Of paramount importance to this court, Alex will not be deprived of counsel of his choice. It is undisputed that throughout the grand jury proceedings to the present, Alex has been represented by Walsh, whom he chose and retained as counsel. Walsh has been intimately involved in the pretrial stages of this case and will be able to capably represent Alex at trial. Thus, even though Alex will not be represented by Genson, his Sixth Amendment rights have not been violated.[9]

### 2. *Former Client–Witnesses' Interests*

For many of the same reasons that we found a violation of Rules 1.9 and 1.10, we believe that the interests of the former clients of GSG will not be adequately protected if Genson were allowed to represent Alex. The parties agree that Gillespie, Steinback and Cohen engaged in and were privy to confidential communications with its former clients. By the same token, Genson participated in at least one meeting involving GSG's former clients. In our view, it is very likely that GSG lawyers are aware of certain matters which could be used to attack the credibility of the witnesses at trial. This is of great concern to this court because Genson now seeks to represent one of the alleged perpetrators of the criminal activity when he and his firm previously represented individuals who were allegedly victims of the *very same criminal activity*. In our opinion, this alone strongly militates in favor of granting the disqualification motion. *United States v. O'Malley,* 786 F.2d at 790.

In this same vein, we are convinced that cross-examination of the witnesses cannot be limited so as to protect the attorney-client privilege. We strongly disagree with Alex that allowing Walsh to conduct the cross-examination of the witnesses or to limit the examination to matters of public record will ensure full protection of the attorney-client privilege. After thoughtful consideration of all "prophylactic measures," we remain steadfast in our opinion that the risk of using or revealing confidential communications against the former clients is too overwhelming in this case.[10]

### 3. *The Government's and the Public's Interests*

We are also convinced that the interests of the government and the public warrant disqualification. In essence, the government argues that Alex does not want a level playing field but one impermissibly skewed in his favor. In support, the government asserts that Genson and GSG were privy to non-public information about the case, including but not limited to, "the reluctance of the witnesses to cooperate" and "the substance of the witnesses' grand jury testimony, and the fact that each of the witnesses and other unspecified business had been victimized by the same racketeering enterprise." (Government's Memo. in Support, p. 11.) Finally, the government maintains that it would be fundamentally unfair to allow them to be cross-examined by their former attorney on the exact subject matter of their prior representation.

In response, Alex wholly fails to address the government's concern that his counsel was privy to non-public information about the case. Instead, Alex states that the government's fear is illusory because the

---

**9.** We have considered and afford little weight to the defense's argument that "Genson and Alex have known each other for approximately eight years." (Alex's Response, p. 9.) Numerous authorities make clear that in considering the various factors in a disqualification motion, courts seek to protect long standing attorney-client relationships. *See United States v. O'Malley,* 786 F.2d 786 (7th Cir.1986); *United States v. James,* 708 F.2d 40 (2d Cir.1983). In light of the foregoing authorities, we are convinced that Alex and Genson do not have such a relationship.

**10.** We also note that Alex's interest in conflict free counsel could be detrimentally effected by retaining a lawyer who has previously represented the government's witnesses. In this court's view, such a handicap could occur despite Alex's offer to waive any conflicts. *See United States v. Moscony,* 927 F.2d 742, 749 (3d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991).

witnesses do not inculpate Alex and because they will not be cross-examined by Genson. For the reasons previously stated in this opinion, we are unpersuaded by these arguments.

Even more important, the public's interest in criminal trials that are fair and free from any appearance of impropriety are only served by disqualifying Genson and GSG. As the Supreme Court cogently reaffirmed in *Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988), "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." The actions of Genson and GSG create a serious appearance of unfairness and are improper.

First, during the grand jury investigation Genson and his partners simultaneously represented both the alleged victims of criminal activity and one of the alleged targets. Initially, Genson and GSG represented the alleged victims of the extortionate acts allegedly committed by Alex and his co-defendants. Two months later, Genson then undertakes to represent one of the alleged perpetrators of the criminal activity. After Genson is purportedly retained by Alex, GSG then cuts off its representation of its former clients and ships them off to new attorneys. By switching sides during a pending investigation, Genson's conduct challenges the very integrity of our adversary system. In addition, such actions might very well have a chilling effect on obtaining victims' assistance in prosecuting organized crime.

Second, neither Genson nor GSG ever informed this court of the possibility of a conflict of interest. This is a very serious matter which this court does not take lightly. In fact, on March 20, 1992, three months after the trial date had been set, the defense reveals to this court *for the first time* that Alex retained Genson on August 9, 1991. In its responsive brief, the defense further reveals that Genson has met with Alex and Walsh on the average of at least twice a week since August; that

Genson has assisted Walsh in the preparation of Alex's pretrial motions; and that "Genson has been intimately involved with all aspects of the defense." (Alex's Response, p. 6.) Yet, for some inexplicable reason this court was never informed that Genson intended to represent Alex.

Implicit in this argument is the suggestion that Genson should be allowed to proceed as Alex's counsel because he has spent considerable time on Alex's defense. We do not agree. To allow Genson to proceed as Alex's co-counsel would discourage, rather than encourage, attorneys to disclose conflicts of interest. We will not sanction such an anomalous result.

Equally egregious, Genson never filed an appearance on behalf of Alex which complies with Rule 3.15 of the General Rules of the United States District Court for the Northern District of Illinois ("the Local Rules"). Local Rule 3.15 provides, in relevant part, that "[t]he attorney of record may not withdraw, nor may any other attorney file an appearance on behalf of the same party or as a substitute for the attorney of record, *without first obtaining leave of court.*" (Emphasis added). Walsh filed his appearance on December 23, 1991. Genson filed his appearance on March 2, 1992, and only now seeks leave of court to do so. This is exactly the type of conduct which casts doubt on the integrity of the bar and undermines the public's confidence in our adversarial system. In light of the foregoing, we believe that the interests of the former client-witnesses, the public and the government outweigh Alex's choice of Genson as co-counsel to represent him at trial.

## CONCLUSION

For all of these reasons, we grant the government's motion to disqualify Edward M. Genson and the law firm of Genson, Steinback & Gillespie from representing defendant Gus Alex. In addition, the court strikes the appearance of Edward M. Genson filed on March 2, 1992.