### STATE of Minnesota, Respondent,

v.

### Adrian Lamont PATTERSON, Appellant.

#### No. A10–563.

Court of Appeals of Minnesota.

March 15, 2011.

518

Lori A. Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Theodora Gaitas, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by KLAPHAKE, Presiding Judge; LARKIN, Judge; and COLLINS, Judge.*

## OPINION

LARKIN, Judge.

Appellant seeks reversal of his convictions of aiding and abetting drive-by shooting and aiding and abetting second-degree murder, arguing that he was deprived of his constitutional rights to counsel of his choice and conflict-free counsel and that the district court committed reversible error in admitting gang evidence at his jury trial. Appellant also requests modification of his sentence, arguing that the district court erred in regard to the order in which it sentenced the offenses. Because the district court did not abuse its discretion in disqualifying appellant's first attorney, appellant waived his right to conflict-free counsel as to his second attorney, and the district court did not abuse its discretion in admitting gang evidence, we affirm appellant's convictions. And because the district court properly sentenced appellant's offenses in the order of occurrence and the resulting sentence does not unfairly exaggerate the criminality of appellant's conduct, we affirm his sentence.

## FACTS

Following a jury trial, appellant Adrian Lamont Patterson was convicted of aiding and abetting drive-by shooting and aiding and abetting second-degree murder. The victim of the murder was R.A. The victim of the drive-by shooting offense was T.D., a passenger in R.A.'s car. The offenses occurred on November 23, 2003. On that date, Leroy Paul was driving a vehicle, and Patterson was his front-seat passenger. Paul began following a vehicle driven by R.A. Paul and R.A. were members of the same gang, the "Crips." But their relationship was strained. Testimony at trial

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by

appointment pursuant to Minn. Const. art. VI, § 10.

suggested that R.A. believed that Paul had killed his friend F.W. approximately one year earlier and that R.A. had fired shots at Paul in retaliation.

After following R.A. for some distance, Paul positioned his vehicle next to R.A.'s. Patterson leaned out of the passenger window of Paul's vehicle and shot R.A. R.A. drove himself to the hospital, where he later died.

In 2009, Paul and Patterson were charged in connection with the November 23 shooting. Paul was indicted for two counts of first-degree murder and two counts of attempted first-degree murder. He pleaded guilty to second-degree murder pursuant to a plea negotiation with the state. In exchange for a reduced sentence, Paul agreed to testify against Patterson.

Patterson was indicted for two counts of first-degree murder and two counts of attempted first-degree murder. His case was tried to a jury. Prior to trial, the state moved to disqualify two different defense attorneys who Patterson had retained. The state moved to disqualify Patterson's first attorney, Eric Newmark, based on a conflict of interest. Patterson opposed the motion. He provided the district court with an on-the-record waiver of his right to conflict-free counsel, after consulting with independent counsel, Peter Thompson, regarding Newmark's conflicts of interest. The record indicates that Patterson's consultation with Newmark and Thompson was extensive. At the waiver hearing, Patterson stated:

> Your Honor, let me start out by saying that I completely understood you when you were explaining to me about the conflict of interest.... Mr. Thompson and [Newmark] had come to see me, and they had spent an hour explaining it to me more clearly. I understand the conflicts of interest. I believe [Newmark]

is the best lawyer for my case.... I would like him to remain as my counsel. I trust him, and I trust he will do his very best at protecting my life.

The district court held several hearings on the disqualification motion and ultimately disqualified Newmark over Patterson's objection.

After Newmark's disqualification, Patterson retained attorney Barry Voss. Because Voss had represented Paul during his trial for murdering F.W. and that murder was related to R.A.'s murder, the state moved to disqualify Voss. At a hearing prior to the state's disqualification motion, Voss indicated that Paul had not made any privileged communications to him regarding matters related to R.A.'s murder. Gary Bryant Wolf, who represented Paul in the R.A. murder case, indicated the same. However, Wolf informed the court and counsel that in the event Paul had made privileged communications to Voss relating to R.A.'s murder, Paul would not waive his attorney-client privilege as to Voss.

The district court held a hearing on the state's motion to disqualify Voss. The district court noted that because Paul was likely to testify against Patterson, Voss would have to "cross examine Paul about matters substantially related to his former representation of Paul." Paul appeared at this hearing and informed the district court that he did not object to Voss representing Patterson so long as Voss did not cross-examine him if he testified at Patterson's trial. Patterson indicated that he wanted to keep Voss as his lawyer and that he had no objection to Voss retaining an independent lawyer to cross-examine Paul. Although the district court acknowledged that Voss had a potential conflict of interest, it determined that Paul's and Patterson's interests would be sufficiently protected if they provided appropriate waiv-

ers. Presuming that Patterson's waiver would be obtained, the district court denied the state's motion to disqualify Voss on the condition that Voss retain an independent lawyer who would be prepared to cross-examine Paul if Paul testified against Patterson.

Patterson later offered an on-the-record waiver of his right to effective assistance of counsel as it related to Voss's potential conflict of interest. At the waiver hearing, the district court told Patterson, "I understand that you want to proceed to trial with Mr. Voss as your lawyer, and [another lawyer] will cross-examine Mr. Paul." Patterson responded, "Correct." The district court informed Patterson that Voss might not be as aggressive "because one of his former clients is a witness against you." Patterson stated that he understood. The district court further stated that "if a jury were to find you guilty and if you then were appealing ... you could not say on appeal or you're giving up your right to say on appeal that 'I didn't get a fair trial because Barry Voss formerly represented Leroy Paul.' " Patterson again stated that he understood. The district court accepted Patterson's waiver, noting that Patterson had discussed conflict-of-interest issues with his previous attorney, Eric Newmark, as well as independent-counsel Thompson.

At the ensuing trial, the district court allowed, over Patterson's objection, evidence showing that R.A.'s murder was the result of an intra-gang dispute. A.W. testified that Patterson was a "Crip" and that "[w]e was all Crips." And during closing argument, the prosecutor argued that R.A.'s murder was gang motivated: "On November 23, 2003, shortly before 2:30 a.m., this defendant and Leroy Paul murdered [R.A]. This defendant did Leroy Paul's dirty work. How did this come about? [A.W.], Leroy Paul, [J.R.], [R.A.]

and this defendant were associated with the Crips—The Crips gang."

The jury found Patterson guilty of the lesser-included offenses of aiding and abetting drive-by shooting as to T.D. and aiding and abetting second-degree murder as to R.A. The district court sentenced Patterson to concurrent prison terms of 48 months for the drive-by shooting offense and 326 months for the murder. This appeal follows.

## ISSUES

I. Did the district court violate Patterson's right to counsel of choice by disqualifying his first attorney over his objection?

II. Did Patterson validly waive his right to conflict-free counsel with regard to his second attorney?

III. Did the district court abuse its discretion by admitting gang evidence?

IV. Did the district court err by sentencing Patterson for the drive-by shooting before the murder?

## ANALYSIS

Patterson argues that he was denied his constitutional right to his choice of counsel when the district court disqualified Newmark, that he was denied his right to conflict-free counsel when the district court refused to disqualify Voss, and that he was prejudiced by the district court's erroneous admission of gang evidence at trial. Patterson also argues that the district court erred by sentencing the drive-by shooting offense before the murder. We address each argument in turn.

### I.

A criminal defendant has a constitutional right to counsel. U.S. Const. amend. VI; Minn. Const. art. I, § 6. The

Sixth Amendment right to counsel includes the right to retain counsel of one's choice. *See United States v. Gonzalez–Lopez*, 548 U.S. 140, 150, 126 S.Ct. 2557, 2564, 165 L.Ed.2d 409 (2006) (holding that the violation of a defendant's right to counsel of choice is a structural error not subject to review for harmlessness). But the right to retain counsel of one's choice does not include a right to retain an attorney having an actual conflict or a serious potential for a conflict of interest. *Wheat v. United States*, 486 U.S. 153, 163–64, 108 S.Ct. 1692, 1699–1700, 100 L.Ed.2d 140 (1988). The right to counsel of one's choice may be overcome by the judiciary's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. at 1698.

■■■■ In ruling on a disqualification motion, the district court must recognize a "presumption in favor of [the defendant's] counsel of choice." *Id.* at 164, 108 S.Ct. at 1700. A violation of a rule of professional conduct does not automatically require an attorney's disqualification. *See Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 991 (8th Cir.1978) ("Although the Code of Professional Responsibility establishes proper guidelines for the professional conduct of attorneys, a violation does not automatically result in disqualification of counsel."). At the same time, a district court is "allowed substantial latitude" in ordering disqualification before trial when it is shown that the defendant's attorney is facing an actual or a serious potential for a conflict of interest. *Wheat*, 486 U.S. at 163, 108 S.Ct. at 1699. In exercising this discretion, courts may consider (1) the prejudice to the defendant which would result from the disqualification of his lawyer; (2) the state's interest in preserving the finality of a judgment in

the face of an ineffective-assistance-of-counsel claim; (3) the court's interest in preserving the ethical standards of the legal profession; and (4) the public's interest in having a criminal justice system that is perceived as fair. *See generally* La-Fave, Israel, King and Kerr, *Criminal Procedure*, § 11.9(c), at 895 n. 105 (3d ed.2007).

■■■■ A criminal defendant, although constitutionally entitled to conflict-free counsel, can waive that right. *See Holloway v. Arkansas*, 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 1178 n. 5, 55 L.Ed.2d 426 (1978) (stating that "a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests"). Therefore, a district court need not disqualify an attorney with a potential conflict of interest if the defendant provides a satisfactory waiver of conflict-free counsel. Of course, like all waivers of important trial rights, the waiver of conflict-free counsel must be voluntary, knowing, and intelligent. *United States v. Falzone*, 766 F.Supp. 1265, 1271 (W.D.N.Y.1991).

■■■■ Notwithstanding a defendant's waiver, in cases involving successive representation, disqualification may be required if the defense lawyer previously represented a state's witness by assisting that witness in presenting testimony before a tribunal investigating the subject matter of the current criminal charges against the defendant, and the defense lawyer's obligation to the defendant at trial requires the lawyer to discredit the state's witness's trial testimony that is substantially related to the witness's former testimony. *See United States v. Gotti*, 9 F.Supp.2d 320, 327–29 (S.D.N.Y.1998) (disqualifying an attorney due to his prior representation of a witness, whom the attorney would need to discredit at trial, in front of a tribunal investigating the criminal charges), *United States v. Malpiedi*, 62 F.3d 465, 469–70 (2d

Cir.1995) (same) *United States v. Iorizzo,* 786 F.2d 52, 57–58 (2d Cir.1986) (same).

■ Similarly, notwithstanding a defendant's waiver in a case involving successive representation, disqualification may be required if a defense lawyer has had a longstanding attorney-client relationship with a state's witness during which the lawyer likely learned about the witness's criminal conduct; the defense lawyer's obligation to the defendant at trial will require the defense lawyer to discredit the former client; and the former client will not waive the attorney-client privilege with the defense lawyer. *See Falzone,* 766 F.Supp. at 1272–76 (disqualifying an attorney who had a longstanding attorney-client relationship with a state's witness, the attorney would have needed to discredit that client at trial, and the client refused to waive his attorney-client privilege); *see also* LaFave, *supra,* at 908 n. 140.

■ This court relies on the Minnesota Rules of Professional Conduct when determining whether an attorney has a conflict that implicates the constitutional right to counsel. *See State v. Paige,* 765 N.W.2d 134, 140 (Minn.App.2009) (using definition provided by rules of professional conduct to determine whether trial attorney had a conflict that violated defendant's constitutional right to counsel). A conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person, or by a personal interest of the lawyer." Minn. R. Prof. Conduct 1.7(a)(2). The Minnesota Rules of Professional Conduct further provide, in relevant part, that

> [a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materi-

ally adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Minn. R. Prof. Conduct 1.9(a). Minn. R. Prof. Conduct 1.9(a) protects two separate interests: (1) "ensur[ing] the attorney's absolute fidelity" and (2) "guard[ing] against inadvertent use of confidential information." *Nat'l Texture Corp. v. Hymes,* 282 N.W.2d 890, 894 (Minn.1979).

■ Although a district court's interpretation of the rules of professional conduct presents a question of law, its decision to disqualify counsel under those rules is reviewed under an abuse of discretion standard. *See Lennartson v. Anoka–Hennepin Indep. Sch. Dist. No. 11,* 662 N.W.2d 125, 129 (Minn.2003) ("interpretation of court rules presents a question of law"); *M.M. v. R.R.M.,* 358 N.W.2d 86, 90 (Minn.App.1984) (finding "no abuse of discretion" in district court's refusal to dismiss attorney due to possible conflict of interest).

In support of its motion to disqualify Newmark, the state alleged that Newmark had several actual or potential conflicts of interest due to his previous representation of three of the state's witnesses, B.H., A.W., and J.R., as well as Patterson's codefendant, Paul. As explained in the sections that follow, the district court thoroughly analyzed Newmark's purported conflicts of interest.

**B.H.**

The state informed the district court that B.H. would be called to testify that in November 2002, B.H. and A.W. observed Paul kill F.W.; in early November 2003, Paul and R.A. each separately told B.H. that R.A. had recently shot at Paul; and in November 2003, just days before R.A. was murdered, B.H. and A.W. observed Paul shoot at R.A.

Newmark had represented B.H. on federal drug and weapons charges in 2003. Newmark negotiated a reduced sentence for B.H. on the federal charges in return for B.H.'s cooperation in the F.W. and R.A. murders. In the disqualification proceeding, Newmark acknowledged that in order to properly defend Patterson, he would have to discredit B.H.'s testimony, the substance of which Newmark had provided to the prosecuting authorities. B.H. refused to waive his attorney-client privilege as to Newmark.

The state also informed the district court that B.H. had shared "information regarding the facts or motive for ... the murder of [R.A.]" with Newmark. During a police interview, an investigator asked B.H. about his communications with Newmark. The investigator asked B.H.: "Would those confidences include information regarding the facts or motive for ... the murder of [R.A.]? Did you talk to him about that case?" B.H. responded "yes."

The district court concluded that in order to effectively represent Patterson, Newmark would need to discredit the very statements that he had helped B.H. provide. The court reasoned:

> In this case, by attacking the credibility of the statements [B.H.] has made to the authorities about the [F.W.] and [R.A.] murders, Newmark would be putting his own role in [B.H.'s] cooperation with the State in issue. Indeed during the cross and redirect examination of [B.H.] during the [F.W.] trial, Newmark's role was presented to the jury.... If [B.H.] is effectively cross examined about his prior statements to the authorities, the State may wish to call Newmark to explain how the substance of [B.H.'s] statements became known to him and then to the State....

[And] if the jury were to learn that Newmark had represented [B.H.] when [he] made his statements to the authorities, Newmark would in effect become "an unsworn witness who could subtlety impart to the jury his first-hand knowledge of events without having to swear an oath or be subject to cross examination."

These were legitimate concerns that at the very least created the potential for conflict at trial. And although Patterson wanted Newmark to continue as his attorney despite the potential conflict of interest and provided an on-the-record waiver of his right to conflict-free assistance of counsel, Patterson was unwilling to waive his right to a mistrial in the event that Newmark's prior representation of B.H. became known to the jury, inadvertently or otherwise.

**A.W.[1]**

The state informed the district court that A.W. would be called to testify that in November 2002, A.W. and B.H. observed Paul kill F.W.; in November 2003, just days before R.A.'s murder, A.W. and B.H. observed Paul shoot at R.A.; and on November 23, 2003, A.W. observed Patterson lean out the passenger-side window of a car that Paul was driving and shoot R.A.

From 1999 through 2005, Newmark represented A.W. in approximately four felony drug cases. In one of those cases, A.W. told the Minneapolis police to talk to Newmark about A.W.'s potential cooperation in the police investigation of the F.W. murder. In 2008, Newmark again represented A.W. following a drug-related arrest. At the time of the disqualification motion, Newmark no longer represented A.W. on that case, but A.W. had secured an agreement for a possible sentence reduction in

---

1. During the disqualification proceedings, A.W., whose identity was protected by a prosecutor's certificate, was referred to as "Witness C."

exchange for his testimony against Patterson. The district court concluded that "[i]n order to properly defend Patterson, Newmark would have to discredit [A.W.'s] testimony." The court further noted that "[A.W.] objects to being cross examined by Newmark." Newmark acknowledged that he would have to retain an independent lawyer to cross-examine A.W.

The district court concluded that Newmark's representation of A.W. was substantially related to his representation of Patterson and that A.W.'s interests were materially adverse to Patterson's. First, Newmark's prior representation of A.W. provided him with information about A.W. that likely would have informed Newmark's cross-examination of A.W. at Patterson's trial. *See Falzone*, 766 F.Supp. at 1275 (extensive history between lawyer and former client that will assist lawyer in cross-examination of former client constitutes a substantial relationship between the former client's matters and the current matter). Second, A.W. agreed to testify against Patterson pursuant to a plea agreement in a case in which Newmark had formerly represented him. Newmark was therefore in a position to use privileged information about that case to cross-examine A.W. Moreover, if A.W. was effectively cross-examined, the federal government could conclude that A.W. was not truthful during his plea agreement and he might lose the benefit of his bargain. And if the jury were to learn about Newmark's former representation of A.W., Newmark's attack on A.W. during closing argument would result in "undue weight" being given to the statements of a lawyer. Lastly, because A.W. did not consent to Newmark's representation of Patterson, the district court properly concluded that this representation violated Minn. R. Prof. Conduct 1.9(a). *See* Minn. R. Prof. Conduct 1.9(a) ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.").

Despite these legitimate concerns, the district court considered whether the conflict could be remedied, as Newmark suggested, by having Patterson retain an independent lawyer to cross-examine A.W. The district court concluded that even if independent counsel could cure a conflict under rule 1.9(a), this was not the proper situation in which to do so because "Newmark would have to attack [A.W.'s] credibility during closing argument."

### J.R. and Paul

The state informed the district court that J.R. would be called to testify that Paul had shot at a vehicle occupied by B.H., A.W., and R.A., from a vehicle that J.R. was driving. Newmark represented J.R. in a 2006 federal drug case, as well as a 2004 gun case. J.R. waived his attorney-client privilege as to his communications with Newmark.

At the time of the disqualification order, Paul had not yet pleaded guilty and therefore it was unknown whether he would testify at trial. Newmark represented Paul in a state court drug case in 1997. Paul also attempted to hire Newmark in connection with the F.W. murder but was unable to do so because Newmark represented B.H. Paul's lawyer objected to Newmark cross-examining Paul.

The district court did not address the significance of Newmark's former representation of Paul and J.R. in detail. The district court stated that "Newmark's conflicts of interest may be more attenuated with respect to these individuals. Perhaps Newmark could survive a disqualification motion if these were his only potential

conflicts. But they are not. On this record, these potential conflicts only add to the appearance of impropriety in having Newmark represent Patterson."

In determining that it was necessary to disqualify Newmark, the district court concluded that "the prejudice resulting to Patterson as a result of disqualifying his attorney of choice is outweighed by the State's interests in the finality of any judgment of conviction, the court's interest in preserving the ethical standards of the legal profession and the public's interest in having a criminal justice system that is perceived as fair." These are proper considerations when determining whether to disqualify defense counsel in a criminal case. *See Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698 (stating that the judiciary has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them"); *Falzone,* 766 F.Supp. at 1273, 1275–76 (stating that "the trial court must consider the possible prejudice to the defendant if disqualification is granted" as well as "the interests of the government and the public" and "the legitimate wish of [trial courts] that their judgments remain intact on appeal" (alteration in original) (quotation omitted)); *United States v. Alex,* 788 F.Supp. 359, 363–65 (N.D.Ill.1992) (considering the interests of the defendant, the witness, the government, and the public on a motion for disqualification).

The district court did not abuse its discretion in balancing these factors. This is not a case where the state sought to interfere with a long-standing attorney-client relationship. Newmark had never before represented Patterson. *See Alex,* 788 F.Supp. at 364 n. 9 (relevant consideration is the prior attorney-client relationship, not the length of time the client has known

the attorney); *Falzone,* 766 F.Supp. at 1273 (fact that attorney-client relationship was short-term reduced prejudice associated with disqualification); *cf. United States v. Stein,* 410 F.Supp.2d 316, 328–29 (S.D.N.Y.2006) (waiver of conflict-free attorney allowed where defendant's attorneys had spent two years preparing for trial and defendant had already paid attorneys nearly $1 million in fees). And any prejudice to Patterson was outweighed by the state's interest in the finality of any judgment of conviction, the court's interest in preserving the ethical standards of the legal profession, and the public's interest in having a criminal justice system that is perceived as fair.

In conclusion, the district court did not abuse its discretion by disqualifying Newmark, and Patterson's right to counsel of choice was not violated.

## II.

■■■ Patterson claims that he was deprived of his constitutional right to conflict-free counsel because attorney Voss had an actual conflict of interest that adversely affected his representation.

The Sixth Amendment right to counsel includes "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *see also Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) ("Representation of a criminal defendant entails certain basic duties," including "a duty to avoid conflicts of interest"). The Minnesota Supreme Court has stated that the Sixth Amendment right to conflict-free counsel "is not limited to cases involving joint representation of co-defendants ... but extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person." *State*

*v. Brocks,* 587 N.W.2d 37, 43 (Minn.1998) (quotation omitted).

Patterson's claim presents a challenge to the district court's decision not to disqualify Voss—which is the very result that Patterson requested in district court. But although Patterson has a constitutional right to conflict-free representation, "a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interest." *Holloway,* 435 U.S. at 483 n. 5, 98 S.Ct. at 1178 n. 5; *see also State v. Olsen,* 258 N.W.2d 898, 905 (Minn. 1977) (stating, "we recognize that the effective representation by counsel, though a constitutional right, may be waived"). We therefore will not consider Patterson's post-trial position change regarding the propriety of Voss's representation so long as he validly waived his right to conflict-free counsel. *See generally State v. Richards,* 456 N.W.2d 260, 263 (Minn.1990) ("[A] defendant who exercises his right to proceed pro se cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." (quotation omitted)).

█ Federal caselaw provides that a waiver of the constitutional right to conflict-free counsel must be voluntary, knowing, and intelligent. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *Falzone,* 766 F.Supp. at 1271 (stating that "the defendant can effectively

waive his right to conflict-free counsel"; however the waiver "must not only be voluntary, but also must be a knowing and intelligent relinquishment of his right to a conflict-free attorney" (citation omitted)). Prior to granting such a waiver,

> the court should advise the defendant of his right to separate and conflict-free representation, instruct the defendant as to the problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with chosen counsel, encourage defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision.

*Falzone,* 766 F.Supp. at 1271 (quotation omitted).

Although Minnesota caselaw, and the Minnesota Rules of Criminal Procedure,[2] address waivers of the right to conflict-free counsel in the context of dual representation, the caselaw does not specifically address the standard for determining the validity of a waiver outside of this context. Moreover, the caselaw and rule of procedure governing waivers in the dual-representation context are based on the Minnesota Supreme Court's "strong disapproval of dual representation," and its resulting adoption of a prospective rule requiring the district court to "act affirmatively to ascertain whether multiple defendants represented by a single counsel are cognizant of the risks of conflicts of interests and whether, in light of those risks, they still wish to maintain their common representation." *Olsen,* 258 N.W.2d at 904 (quotation

---

**2.** When two or more defendants are jointly charged or will be tried jointly, and two or more of them are represented by the same attorney, the district court must elicit a waiver from each defendant in the form of "a narrative statement that the defendant: (a) has been advised of the right to effective representation; (b) understands the details of defense counsel's possible conflict of interest and the potential perils of such a conflict; (c) has discussed the matter with defense counsel, or if the defendant wishes, with outside counsel; and (d) voluntarily waives the constitutional right to separate counsel." Minn. R.Crim. P. 17.03, subd. 5(2).

omitted), 906. Because this case does not involve dual representation, we do not rely on *Olsen* and its progeny. Instead, we rely on caselaw concerning the waiver of the right to counsel in general. *See Richards*, 456 N.W.2d at 264 (discussing the standard used to determine whether a waiver of the right to counsel is knowing and intelligent).

 The validity of a waiver depends "in each case, upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Id.* (quotations omitted). The defendant should be made aware of the "dangers and disadvantages" so the record will establish that "he knows what he is doing and his choice is made with his eyes open." *Id.* (quotation omitted). A thorough inquiry into all pertinent concerns not only protects the defendant, it also "dampens post-trial claims by the defendant that he should not have been allowed to waive his right." *Id.*

Patterson argues that "[t]he record does not fully establish that [his] waiver was knowing and intelligent." Patterson first asserts that Paul did not validly consent to Voss's representation of Patterson and that Paul's invalid consent affected his waiver of the right to conflict-free counsel.[3] Patterson contends that "[b]ecause Paul did not legitimately consent to the representation, Patterson could not either." And Patterson insists that although he "personally acknowledged Voss's conflict of interest and waived the conflict, [his] waiver was inconsequential in the face of Paul's insufficient waiver." We are not persuaded. Distinct interests underlay the waivers of Paul and Patterson. Paul's waiver concerned his interest in his confidential attorney-client relationship with Voss. Patterson's waiver concerned his right to conflict-free representation. And Patterson fails to explain how an invalid waiver from Paul compromised his own waiver.

Patterson next asserts that his waiver was inadequate in that the nature of the conflict was "somewhat understated" because Voss emphasized that there was only a potential conflict of interest when he in fact had an actual conflict. But the nature of Voss's conflict of interest was explained on the record when the district court stated: "[T]he conflict is that conceivably Mr. Voss would . . . not be as aggressive as he otherwise would be because one of his former clients is a witness against you. . . . Do you understand what I am saying?" Patterson stated that he understood the conflict and nonetheless wanted Voss to continue as his attorney.

Patterson also takes issue with Voss's suggestion that having an independent attorney cross-examine Paul was a cure-all solution, arguing:

> Although using an independent attorney to cross-examine Paul may have protected Paul's interest in maintaining his attorney/client confidences, it did little to advance Patterson's interests. As Paul's former attorney, Voss still had a duty of fidelity to Paul. And even though Voss would not be cross-examining Paul, he would still be required to challenge Paul's credibility during closing argument.

Patterson complains that Voss's duty of fidelity and the issue of closing argument

---

**3.** Patterson argues that there were three problems with Paul's waiver. First, Paul's consent was qualified. Second, there is no evidence that Paul confirmed his consent in writing. *See* Minn. R. Prof. Conduct 1.9(a) (requiring the former client to give informed consent in writing). Finally, due to a significant change in circumstances after Paul provided his limited consent, Paul's initial consent was no longer informed.

were not discussed during the waiver hearing. Although the phrase "duty of fidelity" was not used at the waiver hearing, Patterson acknowledged the possibility that Voss might not be as aggressive on his behalf because Voss's former client, Paul, was a witness against him. This example adequately raised the issue of Voss's duty of fidelity to Paul. Moreover, the record shows that Voss's conflict of interest was explained to Patterson. Patterson had an opportunity to discuss the conflict with Voss. And Patterson previously had the opportunity to discuss similar conflict-of-interest issues with Newmark and Thompson during the first disqualification proceeding. Patterson acknowledged the conflict on the record and advised the district court that he nonetheless wanted Voss to continue as his attorney. In addition, the district court clarified:

Now, Mr. Patterson has answered most of these questions either yes or no and not a narrative. I have talked to Mr. Patterson enough about these issues that I do believe Mr. Patterson understands exactly what the potential conflict is, and he knowingly, intelligently, and voluntarily is deciding to proceed with Mr. Voss and [the additional attorney].

The failure to address Voss's duty of fidelity in the context of closing argument does not render the waiver invalid. The record provides little support for Patterson's contention that his waiver was insufficient, which is presumably why Patterson describes his waiver as "at least questionable." We do not agree that the waiver was questionable: it was voluntary, knowing, and intelligent. Patterson was aware of the dangers and disadvantages of waiving his right to conflict-free counsel and made his choice "with his eyes open." *Richards,* 456 N.W.2d at 264. Because Patterson validly waived his right to conflict-free counsel, we will not reverse his convictions on the theory that he was deprived of this right.

## III.

We next consider Patterson's claim that the district court abused its discretion by admitting gang evidence at trial, including evidence of his alleged membership in the "Crips." The state contends that the evidence was properly admitted to show the context and motive for the offenses.

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003) (citation omitted). "Evidence should not be admitted if it is irrelevant or if its probative value is substantially outweighed by the potential of the evidence to prejudice the jury." *State v. Jackson,* 726 N.W.2d 454, 462–63 (Minn. 2007). "[W]here gang evidence is relevant as to motive, it may be admitted." *State v. Buckingham,* 772 N.W.2d 64, 73 (Minn. 2009) (citing *State v. Ferguson,* 581 N.W.2d 824, 834–35 (Minn.1998)). "[M]otive explains the reason for an act" and "concerns external facts that create a desire in someone to do something." *State v. Ness,* 707 N.W.2d 676, 687 (Minn.2006) (quotation omitted).

Evidence was presented at trial indicating that R.A. was murdered due to a rift in the Crips gang. The court allowed admission of this evidence because it was relevant to motive. The district court explained: "I don't think it's unfairly prejudicial because ... the rift in the gang is so closely related to the motive ... The jury is already going to know about the [F.W.] murder anyway, that it was about drugs,

and that there was a prior shooting involving [R.A.] and so forth." Although the district court allowed the evidence, it ordered the state to instruct its witnesses to make no reference to the word "Shotgun"[4] or "Guns." The court also stated that it would give a limiting instruction "as often as [Patterson's attorney] asks me to give it." Accordingly, during its preliminary instructions to the jury, the court instructed the jury as follows:

> During opening statements reference may be made to a conflict between members of a gang. During the trial, any evidence of a conflict between gang members is offered to give you context to the conduct alleged in the charges in this case. Mr. Patterson is on trial for the specific charges; namely, aiding and abetting first degree murder, and aiding and abetting attempted first degree murder. Mr. Patterson is not on trial for any alleged membership in a gang or any alleged association with gang members. Any such membership or association is not a violation of law.

Although the state may have been able to establish that Paul had a motive to kill R.A. without relying on gang evidence because R.A. had shot at Paul shortly before his own murder, the relationship between R.A. and Patterson was more attenuated. The gang evidence provided relevant context and tended to establish a motive for the murder, i.e., Patterson sided with Paul in an intra-gang dispute. Because it was relevant to show motive, the district court did not abuse its discretion in admitting the gang evidence.

 Moreover, the evidence was not unfairly prejudicial. The district court limited the evidence by prohibiting any reference to "Shotgun" or "Guns." And the district court provided an appropriate limiting instruction. *See Buckingham*, 772 N.W.2d at 73 (finding no reversible error due to testimonial references to a gang where the district court instructed the jury that the defendant was not on trial for his gang-member status or for associating with gang members). Because "[appellate courts] presume that jurors follow the court's instructions," *State v. Budreau*, 641 N.W.2d 919, 926 (Minn.2002), we presume that the jury did not convict Patterson solely because he was a purported gang member.

In summary, the district court's decision to admit evidence of Patterson's gang affiliation does not establish a basis for reversal.

## IV.

 Finally, Patterson claims that because his offenses occurred simultaneously, the district court erred by sentencing him for the drive-by shooting before the second-degree murder, arguing that the district court should have sentenced the most serious offense first.

 Multiple sentences for offenses arising from a single course of conduct are generally prohibited. Minn.Stat. § 609.035, subd. 1 (2002). However, when multiple offenses are committed against different persons in the same course of conduct, the district court has discretion to impose one sentence per victim so long as such sentencing does not unfairly exaggerate the criminality of the defendant's conduct. *State v. Montalvo*, 324 N.W.2d 650, 652 (Minn.1982). "The [Minnesota sentencing] guidelines provide that [m]ultiple offenses are sentenced in the order in which they occurred." *State v. Williams*, 771 N.W.2d 514, 522 (Minn.2009) (alteration in original) (quotation omitted). The supreme court has approved this approach

---

4. The Crips were also known as the "Shotgun Crips."

even where the offenses stem from simultaneous conduct. *See id.* (rejecting the argument that the district court erred in the order of sentencing where the district court sentenced defendant's felon-in-possession conviction before his first-degree assault conviction based on its conclusion that the felon-in-possession offense occurred first because defendant needed to possess the firearm to commit the first-degree assault offense). "The interpretation of a statute and the sentencing guidelines are questions of law that we review de novo." *Id.* at 520.

At the time of sentencing, Patterson's criminal history score was zero. The presumptive sentences for Patterson's drive-by shooting and murder offenses were 48 and 306 months respectively. The district court sentenced the drive-by shooting offense first, using a criminal history score of zero. The district court next imposed a sentence of 326 months on the murder, using a criminal history score of one. *See id.* at 521. ("Under the *Hernandez* method, when a defendant is sentenced for multiple offenses on the same day, a conviction for which the defendant is first sentenced is added to his or her criminal-history score for another offense for which he or she is also sentenced."). The drive-by shooting sentence increased Patterson's criminal history score to one and one-half, which was properly rounded down to one. *See* Minn. Sent. Guidelines cmt. II.B.101 (2002) ("No partial points are given—thus, a person with less than a full point is not given that point."). The increased criminal history score increased the presumptive sentence for Patterson's second-degree murder offense from 306 to 326 months. *See* Minn. Sent. Guidelines IV (Supp.2003) (providing that the presumptive sentence for second-degree murder, a severity-level XI offense, for an offender with one criminal history point is 326

months). The district court designated the sentences as concurrent.

In sentencing the drive-by shooting first, the district court reasoned that "[R.A.] did not die until after the drive-by shootings were complete ... this case did not become a murder case until after the drive-by shootings were complete." This argument is persuasive. The sentencing guidelines state that offenses are sentenced in the order in which they occurred. Minn. Sent. Guidelines II.B.1 (2002). An offense is defined by its elements. *See State v. Dalbec,* 789 N.W.2d 508, 511 (Minn.App. 2010) ("A jury cannot convict a defendant unless it unanimously finds that the government has proved each element of the charged offense."), *review denied* (Minn. Dec. 22, 2010).

Patterson fired multiple gunshots at a vehicle that R.A. was driving; T.D. was R.A.'s passenger. The drive-by shooting offense was complete once Patterson fired at R.A.'s vehicle. *See* Minn.Stat. § 609.66, subd. 1e(a) (2002) (stating that "[w]hoever, while in or having just exited from a motor vehicle, recklessly discharges a firearm at or toward another motor vehicle or a building is guilty of" drive-by shooting). The murder did not occur until R.A. died. *See* Minn.Stat. § 609.19, subd. 1(2) (2002) (stating that a person commits second degree murder by "[causing] the death of a human being while committing ... a drive-by shooting"). The order of sentencing was therefore based on the order in which the offenses occurred, and it was consistent with the sentencing guidelines. Accordingly, we conclude that the district court sentenced appellant's convictions in the correct order.

Nonetheless, Patterson argues that because the sentencing guidelines "do not specify how sentencing should occur under these circumstances, where the defendant's conduct in committing two separate

offenses is virtually indivisible[,] ... this court should hold that the most serious offense should be sentenced first in such situations." Patterson asks this court to adopt a new rule of law under which the most serious offense would be sentenced first, citing *State v. Franks,* 765 N.W.2d 68, 77–78 (Minn.2009) (holding that when a defendant's conduct constitutes more than one criminal offense, Minn.Stat. § 609.035 contemplates that the court will impose a sentence on the most serious of those offenses). But the proposed rule contradicts the express directive of the sentencing guidelines, which has been followed by the supreme court. *See Williams,* 771 N.W.2d at 521. And "[t]his court, as an error correcting court, is without authority to change the law." *Lake George Park, L.L.C. v. IBM Mid–America Employees Fed. Credit Union,* 576 N.W.2d 463, 466 (Minn.App.1998), *review denied* (Minn. June 17, 1998).

We also note that the sentence in this case is subject to the rule that multiple sentences for offenses against different victims may not unfairly exaggerate the criminality of a defendant's conduct. *See Montalvo,* 324 N.W.2d at 652 (stating that "the trial court may impose one sentence per victim in multiple victim cases so long as the multiple sentences do not unfairly exaggerate the criminality of the defendant's conduct"). Patterson was convicted of murdering R.A. and shooting at T.D. during a drive-by shooting. Because the district court sentenced the offenses in the order of occurrence, consistent with the sentencing guidelines, Patterson's sentence increased from 306 to 326 months. This 20–month increase does not unfairly exaggerate the criminality of Patterson's conduct, which resulted in shots being fired at one person and in the death of another. *See State v. Edwards,* 774 N.W.2d 596, 606 (Minn.2009) (explaining that "[w]here multiple victims are harmed by a defendant's conduct during a single behavioral incident, that defendant is more culpable than if he had harmed only one victim").

In conclusion, we discern no sentencing error.

## DECISION

The district court did not abuse its discretion in disqualifying attorney Newmark based on his conflict of interest. In doing so, the district court properly weighed (1) the prejudice that would result to Patterson from the disqualification of his lawyer; (2) the state's interest in preserving the finality of a judgment in the face of an ineffective-assistance-of-counsel claim; (3) the court's interest in preserving the ethical standards of the legal profession; and (4) the public's interest in having a criminal justice system that is perceived as fair. And because Patterson made a voluntary, knowing, and intelligent waiver of his right to conflict-free counsel as to attorney Voss, he cannot complain that his representation was not conflict-free. Moreover, the district court did not abuse its discretion by admitting gang evidence at trial where the evidence of an intra-gang dispute tended to show motive and the court provided an appropriate limiting instruction. Lastly, the district court did not err by sentencing Patterson's drive-by-shooting conviction before his second-degree-murder conviction because the offenses were sentenced in the order in which they occurred and the resulting sentence does not unfairly exaggerate the criminality of Patterson's conduct.

**Affirmed.**