STATE of Minnesota, Respondent,

v.

Adrian Lamont PATTERSON, Appellant.

No. A10–0563.

Supreme Court of Minnesota.

April 25, 2012.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Theodora Gaïtas, Assistant Public Defender, St. Paul, MN, for appellant.

## OPINION

PAGE, Justice.

Appellant Adrian Patterson and his codefendant Leroy Paul were indicted in Hennepin County on two counts of first-degree murder, in violation of Minn.Stat. § 609.185(a)(1), (3) (2010), and two counts of attempted first-degree murder, in violation of Minn.Stat. §§ 609.185(a)(1), (3), 609.17 (2010). For his defense, Patterson retained Eric Newmark as his counsel of choice. Patterson was scheduled to be tried in a joint trial with codefendant Leroy Paul.[1] The State moved to disqualify Newmark as Patterson's counsel based on alleged actual and potential conflicts of interest arising out of Newmark's past representation of Paul and three of the State's prospective witnesses. Even though Patterson waived his right to conflict-free counsel with respect to Newmark, the trial court granted the State's motion on the basis of potential conflicts with two of the State's prospective witnesses.

After retaining another attorney and, following a jury trial, Patterson was found guilty and convicted of second-degree murder while committing a drive-by shooting, in violation of Minn.Stat. § 609.19, subd. 1(2) (2010), and drive-by shooting, in violation of Minn.Stat. § 609.66, subd. 1e(b) (2010). On appeal to the court of appeals, Patterson claimed that: (1) his right to

counsel of choice was violated when the trial court disqualified Newmark; (2) his right to conflict-free counsel was violated because the attorney who ultimately represented him at trial had a conflict with one of the State's witnesses; (3) the trial court improperly admitted gang evidence; and (4) he was improperly sentenced. The court of appeals affirmed in all respects. We granted review on the sole issue of whether Patterson was deprived of his right to counsel of choice. We affirm.

## I.

The trial court record indicates that shortly after 2 a.m. on November 23, 2003, a three-car chase was in progress in downtown Minneapolis. Patterson and Paul were traveling together in one car: Paul was driving and Patterson was sitting in the front passenger seat. They were chasing a car driven by Rashante Artison, who was accompanied by a passenger. Antonio Wilson was driving a third car somewhere behind the other two cars. Leaning out of the passenger window, Patterson began to shoot a gun at Artison's car. Patterson continued to shoot as Paul maneuvered their car so that it was parallel to Artison's car. Upon seeing Patterson shooting, Wilson tried to stop Patterson by shooting a gun towards Patterson, but Wilson's gun jammed after firing one shot. Wilson then drove into the back of the car Paul was driving, causing an accident. After the accident, Patterson got out of the car and walked away. Artison, who had been hit by one of Patterson's shots, managed to drive to the hospital, but eventually died from the gunshot wound.

The subsequent police investigation stalled until December 2008, when the

---

1. Paul ultimately pled guilty before trial and therefore Patterson was tried alone in connection with the death of Rashante Artison, the victim in this case.

Minneapolis Police Department was contacted by two individuals who provided new information. Following further investigation as a result of this information, Paul and Patterson were indicted on two counts of first-degree murder and two counts of attempted first-degree murder.

At Patterson's 2009 trial, the State's theory of the case was that Artison's murder was caused by an intra-gang conflict that arose following the November 2002 murder of Fred Williamson. On the morning of November 7, 2002, Williamson and Paul had a confrontation outside a café, based on Paul's belief that Williamson had stolen money and drugs from him. Bryan Herron, who was present along with Wilson, broke up the confrontation; then Herron, Wilson, and Williamson left in a car. At some point, Paul pulled up next to their car and shot Williamson, killing him. In retaliation for Paul killing Williamson, Artison attempted to shoot Paul in early November of 2003. Paul responded on November 13, 2003—just one week before Artison was killed—by shooting at Artison. Paul was later convicted of killing Williamson and was sentenced to life in prison.

Believing that there was a connection between the Williamson and Artison murders and that they were gang related, the State planned to call witnesses who would testify at Patterson's trial about events surrounding the Williamson murder, the subsequent intra-gang conflict that developed, and Artison's murder. Those witnesses included Herron, Wilson, and Jermaine Richardson, each of whom had been previously represented by Newmark. Newmark had also previously represented Paul. As a result, the State moved to disqualify Newmark from representing Patterson. Patterson objected and a number of hearings were held on the State's motion. While the motion was pending, Patterson consulted extensively with independent counsel about the potential for conflicts of interest based on Newmark's past representation of Herron, Wilson, Richardson, and Paul. After consulting with the independent attorney, Patterson was satisfied that there were no actual or potential conflicts of interest, but nevertheless waived his right to conflict-free counsel. But Patterson did not waive his right to move for a mistrial in the event an actual conflict arose during trial.

Despite Patterson's waiver of conflict-free counsel, the trial court granted the State's motion to disqualify Newmark, finding that Newmark's previous representation of Wilson and Herron presented potential conflicts of interest. Patterson eventually retained another attorney as trial counsel. As noted, the jury found Patterson guilty of second-degree murder while committing a drive-by shooting and of drive-by shooting.

 In affirming Newmark's disqualification on appeal, the court of appeals held that "the district court thoroughly analyzed Newmark's purported conflicts of interest," *State v. Patterson*, 796 N.W.2d 516, 524 (Minn.App.2011), and "any prejudice to Patterson was outweighed by the state's interest in the finality of any judgment of conviction, the court's interest in preserving the ethical standards of the legal profession, and the public's interest in having a criminal justice system that is perceived as fair," *id.* at 527. We review a district court's disqualification of a defendant's counsel of choice for an abuse of discretion. *See Moose v. Vesey*, 225 Minn. 64, 69, 29 N.W.2d 649, 653 (1947).

## II.

We begin with the trial court's disqualification of Newmark based on Newmark's previous representation of Wilson. The State planned to call Wilson at trial as a

witness to the Williamson and Artison murders and as a witness to Paul shooting at Artison days before Artison was killed. Between 1999 and 2005, Newmark represented Wilson in approximately four felony drug cases. While one of those cases, which arose in December 2002, was pending, Wilson told police that he was present when Williamson was murdered and told police to talk to Newmark regarding whether Wilson would cooperate in the investigation into Williamson's murder. Two weeks later, Newmark told police that he would talk to Wilson about whether Wilson wanted to cooperate. Although it is not clear from the record, it appears that nothing resulted from any discussion Newmark may have had with Wilson in 2002 regarding cooperating with police on the Williamson murder.

In August or September 2008, Wilson was arrested on federal drug charges and retained Newmark following his arrest. Together, Wilson and Newmark reviewed police reports and had privileged communications about the facts underlying Wilson's arrest. Wilson was later indicted on the federal drug charges in connection with the arrest and was appointed different counsel for the case. Wilson's new attorney negotiated a plea agreement with the federal government in which Wilson agreed to cooperate in the prosecution of Patterson and Paul for Artison's murder. Wilson testified before the grand jury that indicted Patterson and Paul, and later testified at Patterson's trial. Wilson objected to being cross-examined by Newmark in the Patterson matter.

Based on these facts, the State argued that Newmark's previous representation of Wilson created a potential conflict of interest because Newmark would have to discredit his former client, Wilson, by cross-examining him at trial, which might jeopardize Wilson's interests and Patterson's interests. The State further argued that Patterson's waiver of conflict-free counsel was not sufficient to eliminate the potential conflict because Patterson could not waive Newmark's ethical obligations to Wilson. Finally, the State argued that employing an independent attorney to cross-examine Wilson would risk Patterson losing the effective assistance of counsel and unnecessarily prolong the trial proceedings.

In response, Patterson argued that, because the State failed to demonstrate that Wilson's interests were adverse to Patterson's, no actual conflict or serious potential for conflict would arise from Newmark's representation of Patterson. Moreover, Patterson argued that disqualifying his counsel of choice was an "extraordinary" remedy, which was not necessary because a less extraordinary remedy was available—namely, Patterson's waiver of conflict-free counsel. Finally, Patterson argued that an independent attorney could cross-examine Wilson if necessary.

After considering the parties' arguments and Patterson's waiver of conflict-free counsel, the trial court disqualified Newmark as Patterson's counsel. The trial court reasoned that there was a potential conflict with respect to Wilson because Newmark would need to discredit Wilson's testimony and, in doing so, Newmark might inadvertently use confidential information to cross-examine Wilson. The court was also concerned that "an effective cross examination of [Wilson] could cause the federal government to conclude that [Wilson] was not truthful during his plea negotiations," meaning Wilson might lose the benefit of his cooperation with the State. Finally, the trial court rejected the solution of employing independent counsel to cross-examine Wilson because Newmark would still have to discredit Wilson during closing argument, creating at a minimum an "appearance of disloyalty."

■ It is well settled that criminal defendants who do not require appointed counsel have a right to their counsel of choice. *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("It is hardly necessary to say that ... a defendant should be afforded a fair opportunity to secure counsel of his own choice."). This right derives from the constitutional guarantee that "[t]he accused shall enjoy the right ... to have the assistance of counsel in his defense." Minn. Const. art. I, § 6; *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."); *United States v. Gonzalez–Lopez*, 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). It is a right grounded in the constitutional principle of fairness. *Gonzalez–Lopez*, 548 U.S. at 146, 126 S.Ct. 2557 ("[T]he Sixth Amendment right to counsel of choice[ ] .... commands[ ] ... that a particular guarantee of fairness be provided-to wit, that the accused be defended by the counsel he believes to be best."). Further, the right stands on its own and does not "derive[ ] from the Sixth Amendment's purpose of ensuring a fair trial." *Id.* at 147, 126 S.Ct. 2557.

■ The right to counsel of choice, however, is not unlimited. A defendant does not have an absolute right to retain counsel who has actual or potential conflicts of interest. *See, e.g., id.* at 151–52, 126 S.Ct. 2557 (noting that a defendant may not "demand that a court honor his waiver of conflict-free representation"). In *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the United States Supreme Court set out the framework for determining a defendant's right to retain his counsel of choice when actual or potential conflicts of interest exist. In making that determination:

The District Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

*Id.* at 164, 108 S.Ct. 1692. Thus, we afford "substantial latitude" to a trial court's decision to disqualify a criminal defendant's choice of counsel and review the decision for an abuse of discretion. *See id.* at 163, 108 S.Ct. 1692; *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir.1993). Trial courts are afforded substantial latitude because they "have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692. The Court also noted that trial courts have a "legitimate wish ... that their judgments remain intact on appeal." *Id.* at 161, 108 S.Ct. 1692.

■ Applying the *Wheat* framework to the trial court's disqualification of Newmark based on his previous representation of Wilson, we conclude that the trial court did not abuse its discretion when it disqualified Newmark from representing Patterson. In disqualifying Newmark, the trial court reasoned that Newmark faced a potential conflict based on his past representation of Wilson because Newmark had learned information about Wilson during that representation that would be relevant to his cross-examination of Wilson on Patterson's behalf. The trial court reasoned further that an effective cross-examination by Newmark could have an adverse impact on Wilson by causing the government to reconsider its plea agreement with Wilson.

Rule 1.7(a)(2) of the Minnesota Rules of Professional Conduct provides that an attorney "shall not represent a client if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a former client." Minn. R. Prof. Conduct 1.7(a)(2).[2] Rule 1.9(a) provides:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Client "[m]atters are 'substantially related' . . . if . . . there . . . is a substantial risk that confidential factual information as would normally have been obtained in the [previous] representation would materially advance the client's position in the subsequent matter." Minn. R. Prof. Conduct 1.9, cmt. 3.

Here, in defending Patterson, Newmark would have needed to mount a strong challenge to Wilson's credibility on cross-examination given Wilson's expected testimony explaining the circumstances that led to Artison's shooting and his expected testimony that he saw Patterson shoot Artison. That need to effectively cross-examine Wilson, coupled with information Newmark would normally have obtained during his past representation of Wilson, created a substantial risk that confidential information would materially advance Patterson's defense. Given how we define a "substantially related matter," Newmark's previous representation of Wilson was substantially related to his representation of Patterson. Moreover, Patterson's interests in his case were materially adverse to Wilson's interests in Patterson's case. Further, Newmark's past representation of Wilson materially limited Newmark's representation of Patterson because of the limits placed on Newmark's ability to effectively cross-examine Wilson. Newmark's representation of Patterson would have, of necessity, raised ethical questions implicating Rules 1.7(a)(2) and 1.9 of our Rules of Professional Conduct. And Newmark's past representation of Wilson would have made it difficult for Newmark to effectively cross-examine Wilson on Patterson's behalf, thereby calling into question the fairness of Patterson's trial. As a result, we conclude that the trial court did not abuse its discretion when it granted the State's motion to disqualify Newmark from representing Patterson based on Newmark's previous representation of Wilson.

■■■ Concerns about the finality of the proceedings also support the conclusion that the trial court did not abuse its discretion when it disqualified Newmark. Criminal defendants have a constitutional right to be represented by an attorney who is not burdened by conflicts of interest. *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On appeal from a conviction, a defendant might argue that his right to conflict-free counsel was violated, even if the defendant waived that right, creating the possibility that the trial court might be "whip-sawed by assertions of error no matter which way they rule." *Wheat,* 486 U.S. at 161, 108 S.Ct. 1692 (internal quotation marks omitted). Moreover, we note that here, although Patterson waived his right to conflict-free counsel, he did not waive his right to move for a mistrial based on actu-

---

**2.** The exception to Rule 1.7(a), found in paragraph (b), does not apply to the facts of this case. Minn. R. Prof. Conduct 1.7(b).

al conflicts of interest. *See Ryan v. Eighth Jud. Dist. Ct.*, 123 Nev. 419, 168 P.3d 703, 710 (2007). Thus, if the trial had proceeded and an actual conflict had arisen, the proceeding's finality would have been in jeopardy.

In light of the trial court's legitimate interests in upholding the ethical standards of the profession, ensuring both that Patterson's trial was actually fair and that it also appeared to be fair, and in keeping its judgments intact on appeal, the trial court did not abuse its discretion when it disqualified Newmark as Patterson's counsel. We recognize the difficulty associated with determining the seriousness of *potential* conflicts and that considering disqualification motions requires fact-intensive inquiries. But, it is precisely because of their fact-intensive nature that such decisions are appropriately left to the sound discretion of trial courts. Here, the trial court thoroughly considered the potential conflicts and exercised sound reasoning when it disqualified Newmark. Although it is true that, given the same set of circumstances, not every trial court would have disqualified Newmark, we hold that it was not an abuse of discretion for the trial court to do so in this case.[3]

Affirmed.

---

**3.** Having concluded that the trial court did not abuse its discretion when it disqualified Newmark based on his previous representation of Wilson, we do not need to determine whether the trial court abused its discretion when it also disqualified Newmark based on Newmark's previous representation of Herron.