*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1944**

State of Minnesota,
Respondent,

vs.

Fredrick Dewayne Hines,
Appellant.

**Filed September 28, 2015
Affirmed in part, reversed in part, and remanded
Reyes, Judge**

Hennepin County District Court
File No. 27CR1320179

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant Public Defender, St. Paul, Minnesota (for appellant)

   Considered and decided by Reyes, Presiding Judge; Schellhas, Judge; and Harten, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**REYES**, Judge

Appellant Fredrick Dewayne Hines challenges his convictions of first-degree criminal sexual conduct and terroristic threats, arguing that (1) the district court abused its discretion by admitting relationship evidence that was irrelevant and highly prejudicial; (2) the district court plainly erred by allowing non-qualified witnesses to testify as experts; (3) the district court erred by not sentencing the offenses in the order in which they occurred; (4) his conviction was obtained through perjured testimony; (5) the state did not comply with discovery requests and offered fabricated evidence; and (6) his Sixth Amendment right to effective assistance of counsel was violated. We affirm in part, but because we conclude that the district court erred in sentencing the criminal-sexual-conduct offense before terroristic threats, we reverse in part and remand to the district court for resentencing.

**FACTS**

Appellant and M.T. began dating after they met in 2012. Appellant moved into M.T.'s townhome shortly thereafter, where she lived with her 26-year-old son, A.T. According to M.T., appellant quickly became aggressive, jealous, and controlling. At times, appellant asked M.T. to send pictures of herself while she was at work so that he could verify where she was. Appellant also demanded M.T.'s bank statements so that he could monitor her spending. M.T. was not allowed to make eye contact with or speak to other men. M.T. claimed that their arguments turned physical in November 2012 and that appellant would hit M.T. with his hand and other household objects and intimidate

2

and threaten her. After an argument in December 2012, M.T. received visible bruises on her chest where appellant had pushed her.

M.T. first told A.T. about her problems with appellant in May 2013 after she decided she wanted to get an order for protection (OFP) against appellant. However, M.T. changed her mind and decided to give appellant another chance.

On June 18, 2013, M.T. and appellant drove to Minneapolis. M.T. stayed in the vehicle while appellant went into a building. When appellant returned, he was "sweaty and agitated" and questioned whether someone had been to the car to talk to M.T. M.T. told him no, but appellant insisted that someone had and demanded that M.T. tell him the truth. Appellant hit her numerous times in the head, and he began asking M.T. whether the person had raped her. M.T. stated that she eventually agreed with appellant's accusations so that he would stop hitting her. Appellant took M.T. to the hospital, drove past a police squad car, and stopped his vehicle to get the officer's attention. Appellant told Officer Wilks that M.T. had been raped by a person named Norris, whom appellant knew. Officer Wilks accompanied M.T. and appellant to the hospital.

At the hospital, M.T. underwent a sexual-assault examination. The examining nurse noted injuries on M.T.'s face and thigh, but did not find any internal injuries. M.T. provided Officer Wilks with the same account of events that appellant provided earlier.

On June 22, 2013, appellant demanded money from M.T. so that he could purchase drugs and a gun. While driving to several ATMs to withdraw cash, appellant took a sexual enhancement pill. During the early morning hours of June 23, 2013, appellant kept waking M.T. to have sex with him. Appellant was taking drugs and

3

became increasingly paranoid. M.T. refused appellant's sexual advances, but he forced oral sex and intercourse. M.T. stated that appellant was forceful and that the intercourse hurt her because appellant had taken the sexual enhancement pill. M.T. tried to push appellant off, told him that she did not want to have sex, and demanded that he stop. M.T. was fearful of appellant because he had hit her before initiating intercourse and threatened to get a gun. At some point, appellant stopped, and M.T. fell asleep.

Appellant later woke M.T. and demanded that she give him money to purchase a gun. She withdrew $300 from an ATM, gave it to appellant, and they went home. When M.T. woke up again, appellant was not at the home. M.T. became fearful, so she told A.T. to take her to the school where she teaches. There, M.T. locked herself in a classroom and called Officer Wilks. M.T. admitted to Officer Wilks that the alleged rape from June 18, 2013, had never occurred. Officer Wilks stayed on the line with M.T. and advised her to call 911 on the classroom phone.

M.T. told the 911 dispatcher that she had locked herself in a classroom because she was afraid of getting hurt. M.T. also told the dispatcher that appellant was going to purchase a gun and that he wanted "to kill [M.T.] and other people." A deputy arrived at the school and transferred M.T. to Officer Eric Scovil from the Minnetonka Police Department. Officer Scovil observed that M.T. appeared "extremely upset," had a "stoic, expressionless look on her face," was not displaying any outward emotions and appeared to be in a state of "extreme fear and paranoia."

At the police station, Officer Scovil took a statement from M.T. M.T. had difficulty providing Officer Scovil with a chronological order of events. M.T. told

4

Officer Scovil about numerous events, including appellant's jealous behavior, drug use, and abusive behavior. M.T. received a voicemail from appellant while she was giving her statement. The message was played to Officer Scovil, and he recorded it. At the conclusion of the interview, when Officer Scovil was going over the facts of her statement one more time, M.T. informed him about the sexual assault that occurred earlier that day. M.T. was transported to Methodist Hospital for a sexual-assault and physical examination.

At the hospital, investigator Terri Swanson took M.T.'s statement about the alleged sexual assault. M.T. told Investigator Swanson about the events that occurred on June 22 and June 23. Investigator Swanson observed that M.T. was "very withdrawn," had difficulty making eye contact, appeared vulnerable, and had difficulty answering questions. The sexual-assault examination revealed that M.T. had (1) "purplish" bruising on the labia minora; (2) an abrasion on the posterior fourchette area; and (3) a bruise in the cervical area. The nurse conducting the examination opined that her findings were "consistent with forceful recent penetration." Samples of appellant's sperm were recovered from M.T.'s perineal area, rectum, and vagina.

Appellant was charged by a second-amended complaint with felony stalking, first-degree criminal sexual conduct, third-degree criminal sexual conduct, terroristic threats, domestic assault, and second-degree assault. Prior to trial, the district court granted appellant's motion to dismiss the stalking count for lack of probable cause and to sever the second-degree-assault count. The matter proceeded to a four-day bench trial where appellant briefly represented himself after he discharged his public defender.

5

On the second day of trial, appellant requested to have his public defender take over the case. The request was granted. The state presented testimony from eighteen witnesses. Appellant did not present any witnesses. Appellant was found guilty of the charged offenses, and the district court sentenced appellant to 360 months in prison with lifetime conditional release for the conviction of first-degree criminal sexual conduct and to a consecutive term of one year and one day for the terroristic-threats conviction. This appeal followed.

**D E C I S I O N**

**I.** **Relationship evidence**

Appellant challenges the district court's admission of evidence relating to his "bad character and poor behavior during [the parties'] relationship," arguing that it was irrelevant and unfairly prejudicial evidence of his bad character. Specifically, appellant contests eight findings of fact that the district court made in its order. Because appellant did not object to this evidence at trial, we review for plain error.[1] *See* Minn. R. Crim. P. 31.02; *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002). Under the plain-error test, appellant must show (1) error; (2) that was plain; and (3) that affected appellant's "substantial rights." *See Strommen*, 648 N.W.2d at 686. If all three prongs are satisfied, a reviewing court decides whether to address the error to ensure the "fairness and the

---

[1] Before trial, the state moved to offer the challenged relationship evidence. The district court partially granted the motion and determined that the state could introduce relationship evidence, with the exception of a few specifically enumerated instances. The findings of fact that appellant challenges on appeal were included in the state's motion and were ones that appellant did not challenge previously at the outset of trial.

6

integrity of the judicial proceedings." *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998).

*Error*

"Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). But such evidence may be admissible for another purpose, such as evidence of past abuse or threats against the victim in order to show a strained relationship. *State v. Bauer*, 598 N.W.2d 352, 364-65 (Minn. 1999).

In a prosecution for domestic abuse:

> Evidence of similar conduct by the accused against the victim of domestic abuse, or against other family or household members, is admissible unless the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Minn. Stat. § 634.20 (2012); *see also State v. McCoy*, 682 N.W.2d 153, 159 (Minn. 2004). Evidence admitted pursuant to section 634.20 is commonly known as "relationship evidence." *State v. Matthews*, 779 N.W.2d 543, 549 (Minn. 2010). Section 634.20 applies only in domestic-abuse cases, *see State v. Barnslater*, 786 N.W.2d 646, 650 (Minn. App. 2010), *review denied* (Minn. Oct. 27, 2010), and "allows much more latitude" than the exception to rule 404(b), *State v. Word*, 755 N.W.2d 776, 784 (Minn. App. 2008).

The admissibility of prior incidents of domestic abuse pursuant to section 634.20 depends on (1) whether the offered evidence is evidence of similar conduct and

7

(2) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *McCoy*, 682 N.W.2d at 159; *State v. Waino*, 611 N.W.2d 575, 579 (Minn. App. 2000). "'Similar conduct' includes, but is not limited to" domestic abuse, violation of an order for protection, violation of a harassment restraining order, violation of the harassment/stalking statute, or violation of the harassing/obscene-phone-call statute. Minn. Stat. § 634.20. Domestic abuse, as included in the "similar conduct" definition, includes acts against a family or household member encompassing "physical harm, bodily injury, or assault"; terroristic threats; or criminal sexual conduct. *Id*.; *see also* Minn. Stat. § 510B.01, subd. 2 (2014).

Appellant argues that the challenged evidence is not permissible as evidence under section 634.20 because it does not include "similar conduct." We are not persuaded.[2] In *State v. McCurry*, this court explained that the "similar conduct" language is not so limiting and is "more likely meant to encompass general testimony about the relationship, including conduct that does not rise to the level of crimes listed in the definition of 'similar conduct.'" 770 N.W.2d 553, 560 (Minn. App. 2009), *review denied* (Minn. Oct. 28, 2009). In that case, the relationship evidence that was introduced included evidence of "ongoing tension, arguments, or minor spats." *Id., see also, State v. Bauer*, 598 N.W.2d 352, 365 (Minn. 1999) (allowing admission of history of strained relationship to put the relationship into context).

---

[2] Appellant also argues that the evidence was inadmissible as *Spreigl* evidence. Because we conclude that the evidence was admissible as relationship evidence pursuant to Minn. Stat. § 634.20, we need not address appellant's remaining argument.

The challenged evidence here constitutes "similar conduct." Each incident detailed the same type of control, forcefulness, and power that appellant exerted over M.T., causing her to fear him. While appellant is correct in arguing that "asking one's girlfriend for a ride home because the car is out of gas . . . is not similar to sexually assaulting or threatening to kill someone," this argument mischaracterizes the testimony because the challenged testimony was not limited to that conduct. M.T. testified that the reason why she would come to assist appellant when his car ran out of gas was because she was afraid of what would happen if she did not respond. Appellant would threaten to destroy her car. Evidence relating to appellant's jealousy, accusations that she was cheating on him, and demands for money similarly mirror the behavior underlying the charged offenses. Thus, the testimony offered with respect to the parties' relationship was admissible under Minn. Stat. § 634.20.

Appellant argues that even if the evidence was relevant, it should have been excluded because its probative value was outweighed by its prejudicial effect. "Evidence that helps to establish the relationship between the victim and the defendant or which places the event in context bolsters its probative value." *State v. Kennedy*, 585 N.W.2d 385, 392 (Minn. 1998). Moreover, we have held that a district court does not abuse its discretion by allowing relationship evidence that, if believed, can assist the factfinder in assessing the parties' credibility. *McCoy*, 682 N.W.2d at 161. Here, the evidence clearly helps to establish the relationship between appellant and M.T. and places the alleged

9

events into context.  For these reasons, we conclude that the district court did not abuse its discretion in admitting the relationship evidence.[3]

## II.    Expert testimony

Appellant next argues that the district court erred when it allowed Officer Scoval and Investigator Swanson to testify as experts on sexual assault and domestic abuse.  The admission or exclusion of expert testimony is within the broad discretion of the district court, and rulings regarding such testimony are reversed only when the district court clearly abused its discretion.  *State v. Ritt*, 599 N.W.2d 802, 810 (Minn. 1999).

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify . . . in the form of an opinion or otherwise."  Minn. R. Evid. 702.  "The qualifications of the expert need not stem from formal training, and may include any knowledge, skill, or experience that would provide the background necessary for a meaningful opinion on the subject."  Minn. R. Evid. 702 1977 comm. cmt.  Accordingly, the district court must decide "whether the expert is qualified to express [an] opinion, and whether the opinion is helpful because it will assist the trier of fact."  *State v. Sontoya*, 788 N.W.2d 868, 872 (Minn. 2010) (quotation omitted).  Minnesota appellate courts permit police officers to provide expert testimony "concerning subjects that fall within the ambit of their expertise

---

[3] Because we conclude that there was no error, we need not analyze whether the error was plain or whether appellant's substantial rights were affected.  *See Montanaro v. State*, 802 N.W.2d 726, 732 (Minn. 2011) ("[I]f we find that any one of the requirements [of the plain-error test] is not satisfied, we need not address any of the others.").

10

in law enforcement." *State v. Carillo*, 623 N.W.2d 922, 926 (Minn. App. 2001), *review denied* (Minn. June 19, 2001). Because appellant did not object to either testimony at trial, we review for plain error. *See Sontoya*, 788 N.W.2d at 872.

### A.     Officer Scoval

Appellant argues that Officer Scoval was not qualified because he was a patrol officer and did not have any special training on domestic- or sexual-abuse victims. Officer Scoval testified that, in his experience, M.T.'s reaction when she was giving her statement was common for domestic-assault victims. Officer Scoval testified that "frequently victims of domestic violence and domestic assault will not report every single incident or every single time that they're a victim of violence." The district court found that Officer Scoval was credible and that he has responded to hundreds of calls of assaults and domestic assaults. This is supported by the record. The testimony was helpful to the trier of fact in understanding why M.T. did not report the sexual assault until the end of the interview and provided a possible explanation as to why M.T. had difficulty providing a chronological order of events.

### B.     Investigator Swanson

Similarly, appellant argues that Investigator Swanson was not qualified to testify because she "had never participated in or reviewed any peer-reviewed research or studies about documented victims of domestic or sexual assault." Investigator Swanson testified that she had interviewed around 100 sexual-assault victims and that, in her experience, when she interviewed victims "initially after the occurrence it's very difficult for [them] to keep on track." Investigator Swanson also testified that victims are often withdrawn

11

and do not share a lot of details, especially if the assault or abuse is committed by someone with whom the victim was familiar for a long time. This testimony was helpful to the factfinder in understanding M.T.'s behavior and inability to stay focused during questioning.

A district court is afforded broad discretion in its admission or exclusion of expert testimony. Because both Officer Scoval and Investigator Swanson were qualified to testify as experts, the district court did not err in admitting their testimony concerning sexual assault and domestic abuse victims.

Even if it was error to admit the expert opinion, appellant did not demonstrate that the purported error affected his substantial rights. In addition to the testimony of Officer Scoval and Investigator Swanson, the district court made 90 additional findings to support the convictions. Moreover, the district court determined that M.T.'s testimony regarding the assault was credible and it was corroborated by the consistent statements M.T. provided to the nurse who conducted the sexual-assault examination. For these reasons, appellant failed to meet his heavy burden of demonstrating that his rights were substantially affected. *See Griller*, 583 N.W.2d at 741.

### III. Sentencing

Appellant claims that the district court erred by not sentencing the offenses in the order in which they occurred. The state agrees with appellant's claim.

The Minnesota Sentencing Guidelines require that "[w]hen the [district] court imposes consecutive sentences, the court must sentence the offenses in the order in which

they occurred." Minn. Sent. Guidelines 2.F (2015); *see State v. Williams*, 771 N.W.2d 514, 522 (Minn. 2009).

Here, the district court first sentenced appellant to 360 months in prison for his first-degree criminal-sexual-conduct conviction. Next, it imposed a consecutive one-year-and-one-day sentence for his terroristic-threats conviction, for a total of 372 months. However, the record shows—and the district court found—that the terroristic threats occurred *before* appellant committed the sexual assault. It is clear that the court should have sentenced the terroristic threats conviction first. Accordingly, we reverse appellant's sentence and remand to the district court for resentencing.

## IV. Appellant's supplemental arguments

Appellant raises three additional arguments in his supplemental brief, alleging that (1) his conviction was obtained through perjured testimony and thus he was denied the right to a fair trial; (2) the state failed to comply with discovery requests when it suppressed and offered fabricated evidence; and (3) his right to effective assistance of counsel was denied in violation of the Sixth Amendment.[4] We address each in turn.

### A. Perjured testimony

Appellant alleges that the state used perjured trial testimony. Specifically, appellant asserts that M.T.'s testimony that she did not consent to sexual intercourse with appellant on June 23 was false and that the state knew that this testimony was false.

---

[4] In his supplemental brief, appellant argues that he received ineffective assistance of counsel in violation of the Sixth Amendment, and that he was prejudiced by his attorney because of his status as a registered sex offender in violation of his Fourteenth Amendment right to equal protection. Because both are essentially a claim of ineffective assistance of counsel, we address them together below. *See infra* Part IV.C.

Appellant relies on a four-page, typed document entitled "[M.T.'s] interview notes" that appears to be notes that were taken during an interview on December 3, 2013. This document is not in the record, and it is unclear where the document came from or who was the author. While appellant alleges that this was from a meeting that M.T. had with prosecuting attorneys, there is nothing in the record to support appellant's claim. Had appellant sought to introduce this document into evidence at trial, he may have been able to authenticate the document and use it to impeach M.T.'s testimony. Appellant chose not to do so at trial.[5] Because appellant has not provided any facts to support his argument, nor can we find any in the record, this argument is forfeited. *See State v. Wilson*, 594 N.W.2d 268, 271 (Minn. App. 1999), *review denied* (Minn. Aug. 18, 1999) ("An assignment of error based on 'mere assertion,' not supported by argument or authority and not raised in the district court, cannot be considered on appeal.").

**B.       Suppressed and fabricated evidence**

Appellant also asserts that the state failed to comply with his discovery requests when he was not provided with a copy of a recording of the voicemail that he left M.T. while she was giving her statement to Officer Scovil. The record does not support this assertion.

---

[5] On the first day of trial, the district court addressed appellant's outstanding motions and granted appellant's motion (1) to attack M.T.'s credibility and to impeach her testimony and (2) to impeach testimony by extrinsic evidence with the witness's prior inconsistent statement.

On June 26, 2013, appellant served and filed with the court a general, "demand for preservation and disclosure of evidence."[6] On the first day of trial, the district court indicated that it would address all of appellant's "outstanding motions" and, in relevant part, granted appellant's motion "to obtain and enter into evidence the recording of the Minnetonka Police Department that was taken on June 23, 2013." Thus, it appears that appellant received a copy of the recording prior to the date of trial and there was no discovery violation by the state.[7]

Appellant also asserts that the transcript of the recording was fabricated. However, the actual recording was played at trial and a review of the recording shows that it was consistent with the transcript that was presented at trial and did not contain any prejudicial information.[8] Moreover, while the district court included a finding that M.T. received a voicemail and calls from appellant while she was providing a statement to Officer Scoval, there were no findings made with respect to the content of the recording. Because appellant does not provide any relevant facts to support his allegation, and because appellant was not prejudiced by the variation in the transcripts of the recording, this argument is forfeited. *Wilson*, 594 N.W.2d at 271.

---

[6] Additionally, appellant filed a motion with the court to turn over "all evidence." That motion was denied for lack of specificity.

[7] Moreover, at trial, a recording of the voicemail and a transcript of the recording was offered into evidence and appellant indicated that he had no objections.

[8] In appellant's addendum, he attached two different versions of the transcript from the same recording that include slight variations. It is not clear what caused the variations or why appellant had different versions of the transcript. The transcript that was presented at trial was the complete version that did not include any omissions.

## C. Ineffective assistance of counsel

Appellant contends that he received ineffective assistance of counsel because his court-appointed public defender (1) did not like appellant because he was a registered sex offender; (2) knowingly allowed M.T. to provide testimony to the district court that was untruthful; and (3) deliberately did not provide appellant with a copy of the voicemail recording and transcript. Appellant also argues that he was denied effective assistance of counsel when the district court did not appoint different counsel to represent appellant.

"We review the denial of postconviction relief based on a claim of ineffective assistance of counsel de novo because such a claim involves a mixed question of law and fact." *Hawes v. State*, 826 N.W.2d 775, 782 (Minn. 2013). A criminal defendant has the constitutional right to effective assistance of counsel. *State v. Patterson*, 812 N.W.2d 106, 111 (Minn. 2012). However, the defendant bears the burden of proof when bringing an ineffective-assistance-of-counsel claim. *State v. Miller*, 666 N.W.2d 703, 716 (Minn. 2003). To meet this burden, the defendant must "demonstrate that counsel's representation fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn. 1998); *Strickland v. Washington*, 466 U.S. 668, 687-94, 104 S. Ct. 2052, 2064-69 (1984). Ineffective-assistance-of-counsel claims are typically reviewed under the *Strickland* standard.

Appellant has not demonstrated that counsel's conduct "fell below an objective standard of reasonableness"—the first prong under *Strickland*. 466 U.S. at 688, 104 S. Ct. at 2064. Appellant's current allegation—that counsel's representation was affected

16

because of appellant's status as a registered sex offender—is the same allegation that appellant originally asserted to the district court. The district court granted appellant's request to discharge counsel as his legal counsel based on that allegation. Appellant then, halfway through trial, requested that the district court reappoint the same attorney as his counsel. Appellant indicated that he wanted the same attorney to represent him again, that he "would rather [counsel] do the job," and that he was comfortable with counsel's representation despite their earlier differences. After hearing from appellant and counsel, the district court granted appellant's request and appointed the same attorney to represent appellant. Appellant cannot now complain of the same allegations, after he previously indicated that those concerns were no longer present, to demonstrate that counsel's conduct "fell below an objective standard of reasonableness."

Similarly, as discussed above, appellant's allegations that counsel knowingly allowed M.T. to provide false testimony to the court and that he deliberately withheld production of evidence to appellant is not supported by the record and is insufficient to meet the first prong in *Strickland.*

Finally, appellant's argument that he was denied effective assistance of counsel because the district court did not appoint him with different legal counsel is without merit. Prior to granting appellant's request to discharge counsel and proceed pro se, the district court advised appellant that he would not be appointed another public defender and that he would either have to seek private counsel or represent himself. Appellant indicated that he understood this. Prior to trial, and in at least two other hearings, the district court again explained to appellant the consequences of his waiver of counsel.

17

Nonetheless, appellant indicated that he wanted to discharge his attorney. Appellant knowingly, intelligently, and voluntarily waived his right to counsel. Appellant has not provided any authority to support his argument that these actions taken by the district court were erroneous. Moreover, the district court gave appellant an opportunity to relinquish his right of self-representation and allow the same attorney to take over the case in the middle of trial. *See State v. Richards*, 552 N.W.2d 197, 206 (Minn. 1996) (explaining that a defendant does not have an absolute right to relinquish his self-representation and thereby allow standby counsel to take over the case). Appellant has not met his burden of proving that his constitutional right to effective assistance of counsel has been violated.

**Affirmed in part, reversed in part, and remanded.**